DANIEL B. CURRAN and RUTH CURRAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Curran v. Commissioner
Docket No. 488-80.
United States Tax Court
T.C. Memo 1984-92; 1984 Tax Ct. Memo LEXIS 585; 47 T.C.M. (CCH) 1160; T.C.M. (RIA) 84092; February 27, 1984. Lawrence W. Campbell, for the petitioners. H. Steven New, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for calendar year 1975 in the amount of $247,499 and an addition to tax under section 6653(a)[1] in the amount of $12,375. [2] On February 10, 1982, respondent filed an Amended Answer in which he raised additional issues and claimed an increased deficiency of $144,283. This increased deficiency resulted in an increased addition to tax under section 6653(a) of $7,214. On July 30, 1982, respondent filed a Second Amended Answer in which he deleted several issues raised in the first Amended Answer and claimed an increased deficiency and an increased addition to tax in an unspecified amount. On brief respondent stated that the increased deficiency amount claimed in the Second Amended Answer was *588 $143,626, which would result in a $7,181 increase in the previously determined section 6653(a) addition to tax. After concessions by each party, the issues for decision are: (1) Whether petitioners are entitled to a bad debt deduction in the amount of $53,417; (2) whether petitioners are entitled to a $5,650 deduction for payments to creditors of *589 a limited partnership; (3) whether, in 1975, petitioners realized any income upon sale of a partnership interest, for which petitioner received a $750,000 promissory note and relief from partnership liabilities; (4) whether petitioners must recognize $25,156 as ordinary income under section 1250; and (5) whether any part of petitioners' underpayment of income taxes was due to "negligence or intentional disregard of rules or regulations" within the meaning of section 6653(a). Issues (1), (2) and (4) were raised by respondent in his first Amended Answer or Second Amended Answer. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners Daniel B. Curran (hereinafter petitioner) and Ruth Curran, husband and wife, resided in Los Angeles, California, at the time of filing their petition. Petitioners filed a joint Federal income tax return for calendar year 1975 with the Internal Revenue Service Center, Fresno, California. This return shows that it was prepared by a Mr. Otto of the firm of McDonald & Otto. It was mailed to the Fresno Service Center from Santa Ana, California, in an envelope on which had been placed one 13-cent postage stamp, *590 one 10-cent postage stamp and one 1-cent postage stamp. The return address shown on this envelope was "McDonald & Otto, Certified Public Accountants, * * * Los Angeles, California." Petitioners reported $13,327 as their sole income on their joint 1975 Federal income tax return. This amount was shown as received from the Daniel B. Curran Family Trust (Family Trust). The Internal Revenue Service does not have a record of receiving a fiduciary income tax return for calendar year 1975 for the Family Trust, and respondent issued the statutory notice of deficiency in this case to petitioners on October 12, 1979, without benefit of examining the fiduciary return. Thereafter, petitioners filed an amended joint Federal income tax return for 1975. [3] On June 9, 1980, petitioners' representative supplied respondent with an unsigned and undated fiduciary income tax return for the Family Trust in which, for calendar year 1975, various sources of income, expenses, other deductions, and the sale of a partnership interest were reported. The income reported by petitioners on their joint Federal income tax return for 1975 was the amount shown as net income on the copy of the fiduciary return *591 for the Family Trust furnished to respondent. A $53,417 deduction for a bad debt was among the deductions claimed on the fiduciary income tax return for the Family Trust. This deduction was claimed because of the deficit in Jack W. Greene's capital account in Curran and Company (the Company) which he failed to repay upon his retirement as a general partner. Mr. Greene, Greg Moore, Michael F. O'Connell and petitioner, as general partners, formed the Company on September 1, 1968, as a management firm. A major purpose of the Company was to supply private placement and underwriting services primarily to real estate limited partnerships. Many of the partnerships involved medical buildings; the Company also was involved in marketing and promoting clinical computers and programs and in hospital acquisitions, development and financing. According to the Company's Partnership Agreement, petitioner was the managing partner. The Partnership Agreement, *592 having renewable terms of 1 year, provided, in relevant part: 4. Capital. For the purpose of providing funds to finance the business of the Partnership, the profits of the several partners which have not been drawn out by them, and which appear to their credit on the books of the Partnership, shall be treated, for the purposes of this Agreement, as the capital of the Partnership.Each partner shall be credited on the books of the Partnership with the profits thus left in the business from time to time. If the demands of the Partnership business require additional capital, contributions shall be first made by those partners whose percentages of total Partnership capital are respectively less than their profit-sharing percentages. * * * 6. Income and Investment Accounts.
(a) * * * each partner shall have two Partnership accounts, one of which shall be called the "Income Account", which shall reflect the net profits or net losses of the Partnership, and the other of which shall be called the "Investment Account", which shall reflect the equity ownership of the Partnership in any entity whose principal asset consists of real property and which was received by the Partnership *593 (or a nominee of the Partnership) in consideration for the services of one or more of its partners. * * * (b) The net losses of the Partnership (except losses caused by the gross negligence or willful misconduct of a partner or partners, which shall be borne entirely by the partner or partners guilty of such negligence or misconduct) shall be borne by the partners in the same proportions; provided, that if a partner's share of the losses of the Partnership exceeds the amount of such partner's interest in the Income Account, such partner shall not personally be liable for said loss but it shall be debited to his interest in the Income Account and shall create a deficit balance for such partner. * * * 9. Drawings. Each partner shall be allowed to draw from Partnership funds upon proper voucher for all disbursements made by him in the Partnership business. In addition, each partner may draw against his interest in the Income Account such sums as may be reasonable, having due regard to the financial requirements of the Partnership, but in no event shall such withdrawals exceed his interest in the Income Account as shown on the books of the Partnership. Notwithstanding the foregoing, *594 there shall be taken as an expense of the Partnership the ordinary and necessary expenses of Jack W. Greene in moving from Minneapolis, Minnesota, to Los Angeles, California, and such amount shall not be charged to the interest of said partner in the Income Account. 10. Retirement of Partner. * * * (a) With respect to such retiring partner's interest in the Income Account, the remaining partners shall cause the Partnership to pay to the retiring partner the balance of his interest in four substantially equal semi-annual installments, the first of which shall be due 180 days after the end of such year. (b) With respect to such retiring partner's interest in the Investment Account, the remaining partners shall cause the Partnership to pay to the retiring partner his proportionate share of any payments actually received by the Partnership within 30 days after the receipt thereof. During several years, the Company admitted a new partner and several partners retired; each of these changes was documented by written agreement between the Company and the entering or retiring partner. For example, on December 31, 1968, Michael F. O'Connell retired from the Company; on January 1, 1969, A. *595 Jerry Luebbers became a new partner; on July 31, 1970, Mr. Luebbers retired; and on December 31, 1971, Jack W. Greene retired. In the retirement agreement between the Company and Mr. Greene, the Company agreed to employ Mr. Greene as a consultant and independent contractor for the period of January 1, 1972 to June 30, 1972 for a monthly fee of $3,000. As with the retirement agreements between the Company and prior retiring partners, the retirement agreement between Mr. Greene and the Company included the following language: Greene hereby acknowledges that he has no claim against the Partnership or its assets, or against the remaining Partners, except as aforesaid and except with regard to any payments by the Partnership and payable to Greene pursuant to Section 10(b) of the Partnership Agreement; and Greene hereby acknowledges and represents that he has incurred no obligation on behalf of the Partnership not now reflected on the Partnership's books and records. At the time Mr. Greene retired from the Company, a final accounting was not performed to determine the rights and liabilities of either party. However, Mr. Greene was aware that his capital account showed a deficit *596 due to withdrawals in excess of his prior capital contribution. On January 1, 1971, Mr. Greene's investment account showed a deficit of $15,689. During 1971, the Company earned a $175,000 profit. Mr. Greene's share of the Company's profit was approximately $33,000, yet during the year he withdrew approximately $43,000. At yearend 1971, Mr. Greene's capital account reflected a deficit of $53,417. Mr. Greene believed that the Company would satisfy this negative balance by selling a piece of property and by applying his proportionate share of the proceeds against the deficit amount.However, Mr. Greene never acknowledged to anyone that he owed any amount to the Company or to petitioner. Mr. Greene's liquid assets would have been insufficient to cover the deficit amount. In 1978, Mr. Greene talked to the Company's accountant; at that time the accountant did not suggest that Mr. Greene owed money to petitioner or the Company. As successor-in-interest to the Company, petitioner never attempted to sue Mr. Greene for repayment of the deficit amount, and Mr. Greene never attempted to repay the amount. On the Family Trust fiduciary income tax return for 1975 a claimed deduction was *597 made in the amount of $5,650 for payments for Hospital Laundry Company (HLC), a limited partnership formed in 1972. HLC was an affiliate of Hospital Investment Properties (HIP) and was established to furnish linens to various hospitals. Petitioner was the sole general partner of HLC.
By January 23, 1974, HLC had outstanding liabilities of $560,000 and capital of $305,000. At that time, petitioner, as general partner of HLC, entered into a Hold Harmless Agreement with the limited partners. The Hold Harmless Agreement stated that HLC required additional funds to repay immediately such creditors as employees, taxing authorities, government agencies and others. This Hold Harmless Agreement provided that in return for additional capital contributions by the limited partners, petitioner would subordinate his rights to asset distributions. Additionally, petitioner promised that-- if the proceeds from liquidating the Limited Partnership are not sufficient to return to the Limited Partners their entire contributed capital as it exists on the day of dissolution of the Limited Partnership * * *, the General Partner shall personally pay to each of the Limited Partners the balance of capital *598 previously contributed to the Limited Partnership by each Limited Partner and any other liabilities owing by the Limited Partnership to each Limited Partner.* * * This promise was secured by petitioner's interest in HIP. Prior to 1975, a California Superior Court put HLC into receivership in order to satisfy demands from HLC creditors. HLC assets were liquidated, but not all HLC creditors were paid in full. In 1975, because petitioner had been named as a defendant in a court proceeding, he paid certain outstanding HLC liabilities. These payments were made on the dates, in the amounts, and for the purpose as follows: Date
Amount
Paid to
Purpose
2-75
$1,000
American State Bank
Payments on a loan made by
American State Bank to HLC
10-75
225
American State Bank
Payments on a loan made by
American State Bank to HLC
10-75
250
American State Bank
Payments on a loan made by
American State Bank to HLC
11-75
225
American State Bank
Payments on a loan made by
American State Bank to HLC
11-75
250
American State Bank
Payments on a loan made by
American State Bank to HLC
12-75
225
American State Bank
Payments on a loan made by
American State Bank to HLC
12-75
250
American State Bank
Payments on a loan made by
American State Bank to HLC
Subtotal
$2,425
4-75
500
Neben & Starrett,
Payments on a judgment obtained
Attorneys
by Standard Textile
Co, Inc. (a supplier of
linens to HLC) against HLC
and Daniel B. Curran.
9-75
500
Neben & Starrett,
Payments on a judgment obtained
Attorneys
by Standard Textile
Co, Inc. (a supplier of
linens to HLC) against HLC
and Daniel B. Curran.
10-75
500
Neben & Starrett,
Payments on a judgment obtained
Attorneys
by Standard Textile
Co, Inc. (a supplier of
linens to HLC) against HLC
and Daniel B. Curran.
11-75
500
Neben & Starrett,
Payments on a judgment obtained
Attorneys
by Standard Textile
Co. Inc. (a supplier of
linens to HLC) against HLC
and Daniel B. Curran.
12-75
500
Neben & Starrett,
Payments on a judgment obtained
Attorneys
by Standard Textile
Co, Inc. (a supplier of
linens to HLC) against HLC
and Daniel B. Curran.
Subtotal
$2,500
7-75
1,000
Richard Crake,
Payment for legal services
Attorney
provided to and for HLC
Total
$5,925
*599 In the 1975 fiduciary income tax return for the Family Trust, income from the Good Samaritan Hospital of Orange County (GSH) was reported. GSH was formed as a limited partnership in September 1971 by petitioner and Dr. J. D. Nilsson, as general partners, originally under the name of Hospital Investment Properties. GSH was financed exclusively with borrowed funds. Ten limited partners obtained personal loans from banks and advanced these amounts, totaling $500,000, to GSH. Based on Petitioner's individual reputation as a businessman, GSH obtained the remainder of its financing from various banks. These funds were used to purchase, from Dr. Moskowitz, GSH's main building, a license for 255 beds, and a contract to obtain $1 million of equipment. On May 9, 1975, petitioner sold his GSH partnership interest to Dr. Nilsson. Petitioner's decision to sell his partnership interest was based primarily upon four factors: (1) the hospital and its equipment could not be properly maintained because the secondary lender, a California bank, withheld access to funds needed for such maintenance; (2) Dr. Nilsson refused to admit other doctors as limited partners which directly affected the *600 ability of GSH to attract new patients; (3) GSH experienced extreme financial difficulties and was unable to pay its creditors as payments became due; and (4) various GSH creditors pursued lawsuits against petitioner personally. On May 9, 1975, petitioner had a 15-percent interest in the income, gain, loss, deductions, and credits of GSH. He had a deficit in his capital account in the amount of $339,262, which amount was petitioner's share of partnership liabilities in excess of his adjusted basis in his partnership interest. Without benefit of an appraisal, petitioner and Dr. Nilsson negotiated the sale of petitioner's GSH interest to Dr. Nilsson. The consideration petitioner received included a promissory note from Dr. Nilsson with face value of $750,000, an assumption by Dr. Nilsson of petitioner's share of existing GSH liabilities, [4] and a promise by Dr. Nilsson to indemnify and hold petitioner harmless from responsibility for all GSH liabilities. Dr. Nilsson hoped to pay the promissory note in full within 2 years; he anticipated that his salary and GSH management fee would cover the payments. On June 6, 1975, with *601 GSH liabilities exceeding $1 million and more than 150 lawsuits pending against GSH and Dr. Nilsson, GSH filed a petition under Chapter 11 of the Bankruptcy Act seeking protection until a plan could be formulated to effect a financial arrangement with GSH's unsecured creditors. On June 10, 1975, the United States Bankruptcy Court, Central District of California, granted an order allowing GSH to remain in possession of and to operate the hospital until further court order. On November 19, 1979, the United States Bankruptcy Court entered an order confirming GSH's plan of reorganization which provided for full repayment to all creditors of GSH. Between May 9, 1975 and July 1982, petitioner had not paid any amounts to GSH creditors. During that same period, petitioner and his assignee, Richard Weber, made two demands of Dr. Nilsson for payment of the $750,000 promissory note: (1) On October 20, 1975, by letter, Richard Weber requested payment of the note; and (2) petitioner filed a lawsuit for payment. Dr. Nilsson did not pay petitioner or Richard Weber any portion of the promissory note. In July 1982, Western Medical bought the hospital from GSH for approximately $26 million. *602 Western Medical paid $1.1 million in cash and assumed certain liabilities of GSH. Respondent alleged in his Second Amended Answer that prior to petitioner's sale of his interest in GSH, his distributive share of the difference between (1) additional depreciation and amortization taken under section 1250 and (2) straight line depreciation was $27,437. [5] The adjusted basis of GSH in the section 1250 property was approximately $3,314,133, which amount was derived by reducing the cost of the property by the depreciation claimed on the property from 1971 through May 9, 1975. Petitioner's total distributive share of depreciation and amortization deductions attributable to section 1245 property from 1971 through May 9, 1975, was $132,174. On the unsigned and unfiled fiduciary income tax return for the Family Trust for calendar year 1975, a bad debt deduction was claimed in the amount of $53,417. Respondent in his Second Amended Answer claimed that petitioners' *603 income should be increased by that amount, alleging that-- There was never a loan to nor a debt due from Jack W. Greene.Further, if such a debt did exist it did not become worthless in 1975. Accordingly, the petitioners' taxable income for the taxable year 1975 as shown in said Statutory Notice is understated in the amount of $53,417.00. On the 1975 unsigned and unfiled fiduciary income tax return for the Family Trust, a deduction was made in the amount of $5,650 for petitioner's payments on behalf of HLC. Respondent claimed in his Second Amended Answer that the deduction should be disallowed, alleging that-- These payments were made to the creditors of H.L.C. and were not the ordinary and necessary business expenses of the petitioners nor the Daniel B. Curran Family Trust. Accordingly, the petitioners' taxable income for the taxable year 1975 as shown in said Statutory Notice is understated in the amount of $5,650.00. On petitioners' Federal income tax return for calendar year 1975, petitioners did not report the sale of petitioner's interest in GSH.Respondent's notice of deficiency determined that in 1975 petitioners realized a long-term capital gain from the sale of petitioner's *604 GSH partnership interest in the amount of $883,512. Respondent calculated this capital gain as follows: Sales price
$750,000
Forgiveness of indebtedness from
negative capital account
133,512
Total proceeds received
$883,512
Less: tax basis
Gain on sale of interest
$883,512
Respondent's first Amended Answer, filed February 10, 1982, alleged that recognizable capital gain from the sale was $1,004,215, computed as follows: Note received
$ 750,000 Deficit in capital account
339,262 Gain
$1,089,262 Less: ordinary income from
recapture of secs. 1245 and
1250 property
(85,047)
Long-term capital gain
$1,004,215 In respondent's Second Amended Answer, filed July 30, 1982, respondent recalculated the long-term capital gain to be $989,727, computed as follows: Note received
$ 750,000 Relief from liabilities in excess
of basis (i.e. deficit in capital
account)
399,338 Gain
$1,149,338 Less: ordinary income from
recapture of secs. 1245 and
1250 property
(159,611)
Long-term capital gain
$ 989,727 As a result of petitioners' failure to report the sale of petitioner's GSH interest *605 on their 1975 Federal income tax return, respondent in his first Amended Answer claimed that petitioner's taxable income for that year should be further increased, alleging that-- In the Notice of Deficiency the respondent made no adjustments for the ordinary income realized by petitioners in the amount of $85,047.00 from disposition of sections 1245 and 1250 property upon the sale of their partnership interest * * * In his Second Amended Answer, respondent alleged that the increase in petitioners' taxable income due to depreciation recapture equaled $159,611. In his statutory notice of deficiency, respondent determined that-- part of the underpayment of tax for the taxable year 1975 is due to negligence or intentional disregard of rules and regulations. Consequently, the 5 per centum addition to the tax provided by section 6653(a) is asserted for that year. Therein, respondent determined that the section 6653(a) addition should be $12,375. In his Second Amended Answer respondent alleged that the section 6653(a) addition to tax was in excess of $12,375. OPINION The first issue for decision is whether petitioners are entitled to a bad debt deduction in the *606 amount of $53,417. Section 166(a)(1) provides that "there shall be allowed as a deduction any debt which becomes worthless within the taxable year." Section 1.166-1(a), Income Tax Regs., provides that deductibility is predicated upon the debt being owned to the claimant-taxpayer. Section 1.166-1(c), Income Tax Regs., states that-- Only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. * * * Respondent argues that under California partnership laws and for purposes of the Federal tax laws, a debtor-creditor relationship did not exist between Mr. Greene and the Company and, therefore, that the claimed amount was not properly deductible by petitioners. In the alternative, respondent contends that if there was a valid enforceable debt, it became worthless before 1975 and, thus, would not be deductible in 1975. On the other hand, petitioners argue that a debtor-creditor *607 relationship existed and that the debt became worthless in 1975.
A debtor-creditor relationship for purposes of section 166 may exist where there has been an accounting or final settlement, or where an unconditional enforceable promise has been made to pay a sum certain. Bercaw v. Commissioner,165 F.2d 521, 525 (4th Cir. 1948), affg. a Memorandum Opinion of this Court; Kyne v. United states,180 F.Supp. 53 (W.D. Ky. 1958); section 1.166-1(c), Income Tax Regs.Although petitioner testified that he believed a final accounting was made for calendar year 1971 following Mr. Greene's retirement, there is nothing in the record to support that statement. [6] Additionally, the testimony of petitioner and of Mr. Greene clearly indicates that neither in 1971 nor thereafter did Mr. Greene make a specific unconditional written or oral promise to repay the amount of his withdrawals exceeding his capital account.
*608 In our view, the terms of the Partnership Agreement, signed by Mr. Greene, do not constitute such a promise. For example, paragraph 6(a) thereof provides that the Company's profits will be divided among the partners in accordance with their proportionate interests in the partnership; in making excessive withdrawals, Mr. Greene effectively breached his contractual agreement to allow such a proportionate division to occur. This breach merely would give other partners a right to sue Mr. Greene to obtain their proportionate shares of the Company's profits; it would not be a per se unconditional enforcable promise to repay the excessive withdrawals. [7] (See Schaff v. Commissioner,46 B.T.A. 640, 645-646 (1942), where the Court states that the breach of a partnership agreement gave rise to unadjudicated claims rather than to a valid debt.) *609 State law does not support petitioner's claim that Mr. Greene had an unconditional enforceable promise to repay. Although California's partnership laws require partners to deal fairly and act in good faith, the statutes do not equate failure to act in good faith with an explicit unconditional enforceable promise by the perpetrator to restore the other partners to their pre-detrimental positions. [8]
*610 We are of the opinion that for purposes of section 166 there was no debtor-creditor relationship between Mr. Greene and the Company, and consequently we need not address respondent's alternative argument. Accordingly, petitioners are not entitled to the claimed $53,417 bad debt deduction. The second issue for decision is whether petitioners are entitled to a $5,650 deduction for payments to creditors of HLC, a limited partnership of which petitioner was the sole general partner. Respondent argues that petitioners are not entitled to the claimed deduction because the payments were made on behalf of HLC rather than on petitioner's own behalf. Respondent further contends that such expenditure should not be considered ordinary and necessary in carrying on the trade or business of HLC or of petitioner and therefore should not be deducted. On the other hand, stating that Horner v. Commissioner,35 T.C. 231 (1960), is apposite, petitioners assert that the claimed amount is deductible under section 165(c). While we are of the opinion that the instant case is distinguishable from Horner v. Commissioner,supra, we do not consider this fact to be *611 dispositive of the issue in this case. The issue of the deductibility of the $5,650 was raised by respondent in his Amended Answer. Therefore, the burden of proof that the amount is not deductible is on respondent. After HLC was in receivership, petitioner paid a loan of HLC's to a bank and certain expenses of HLC's because he was being sued as general partner for the amount. Ordinarily payment by a partner of an indebtedness of a partnership constitutes either a loan to the partnership or an increase in the partner's capital account. See Kingbay v. Commissioner,46 T.C. 147, 154 (1966); cf. Sennett v. Commissioner,80 T.C. 825 (1983). In the instant case the record shows that HLC was in receivership prior to 1975. It does not show the losses sustained by HLC for years prior to 1975 nor the extent to which petitioner previously had claimed such losses. The record does show that no loss from the HLC partnership was claimed on the 1975 fiduciary tax return or petitioners' 1975 tax return, but it does show that the $5,650 was claimed as an expense *612 deduction. Based upon this record, we conclude that respondent has failed to prove that the claimed $5,650 was not properly deductible by petitioners. In so concluding, we recognize that a part of the payment was for expenses incurred by the partnership and that such expenses might have been deducted by the partnership. However, if such is a fact, respondent has failed to show it and also has failed to show that petitioners' income was decreased or that their HLC loss was increased by such deduction.
Under normal circumstances, a partnership expense is not deductible on the personal income tax return of a partner but rather should be deducted on the partnership return of income, with each partner reporting his pro rata share of the partnership income or loss after such deduction. Wilson v. United States,376 F.2d 280, 297 (Ct. Cl. 1967); Western Construction Co. v. Commissioner,14 T.C. 453, 471 (1950), affd. 191 F.2d 401 (9th Cir. 1951). However, where the partnership agreement so provides or unusual circumstances prevail which require *613 the partner to pay partnership expenses from his personal funds, it has been held that the partner is entitled to deduct the expenses directly. See Graham v. Commissioner,35 T.C. 273, 278 (1960); Klein v. Commissioner,25 T.C. 1045, 1051-1052 (1956).Because respondent has failed to show facts sufficient to support his affirmative allegation that the $5,650 deduction claimed by petitioners is improper, we hold that petitioners may deduct the $5,650. The third issue for decision is whether, in 1975, petitioners realized any income upon the sale of petitioner's partnership interest in the Company for which petitioner received a $750,000 promissory note and relief from partnership liabilities. Section 741 provides that where a partner sells or exchanges his interest in a partnership, he shall recognize gain or loss as from the sale or exchange of a capital asset, except as related to unrealized receivables and inventory items having appreciated substantially in value. *614 Section 752(d) provides that where such a sale or exchange of a partnership interest occurs, "liabilities shall be treated in the same manner as liabilities in connection with the sale or exchange of property not associated with partnerships." Therefore, section 1001 governs the computation of gain or loss from the sale or exchange of a partnership interest. In pertinent part, section 1001(a) provides that "The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain." Petitioners and respondent agree that petitioner sold his partnership interest in GSH to Dr. Nilsson on May 9, 1975. Respondent asserts that in 1975 petitioners realized and should have recognized capital gain from the sale. On brief respondent concedes, in the alternative, that either the promissory note did not have any fair market value at the time of receipt or, if the note could be valued, petitioners made a valid section 453 election to report the gain from the sale under the installment sales method. *615 In either event, respondent conceded that petitioners did not collect any amount on the promissory note in 1975. Petitioners argue that the consideration received at the time of sale was not susceptible to valuation and therefore the sale should be considered a non-reportable "open transaction" under the principles of Burnet v. Logan,283 U.S. 404 (1931). In the alternative, petitioners contend that if the transaction is considered closed, they are entitled to installment sales treatment under section 453. On May 9, 1975, the date of the sale, petitioner's deficit in his capital account was $339,262, which amount was his share of partnership liabilities in excess of his adjusted basis in his partnership interest. In consideration of petitioner's partnership interest, Dr. Nilsson gave petitioner a promissory note with face value of $750,000, assumed petitioner's share of all GSH existing liabilities, and promised to indemnify and hold petitioner harmless from responsibility for all GSH liabilities. Dr. Nilsson did not give petitioner any cash. Petitioner argues that he believed Dr. Nilsson to be insolvent on May 9, 1975, and therefore that the promissory note *616 and assumption of liabilities could not be valued for purposes of determining gain on the sale. The first issue here is whether, under objectively ascertainable circumstances when the obligation was created, a reasonably prudent person would have expected payment. See Eckert v. Burnet,283 U.S. 140 (1931). We conclude that in May 1975 a reasonably prudent person would have likely expected to have been paid on the note and to have been relieved of liability. While petitioner makes it clear that he no longer wanted to be involved in a partnership with Dr. Nilsson [9] and that the two men decided to negotiate the sale without benefit of an appraisal, we find it difficult to believe that petitioner readily would give up his partnership interest in GSH, even in light oif its current financial difficulties, for an empty promise to be relieved of partnership liabilities and for a promissory note which he believed had no value. Furthermore, Dr. Nilsson's testimony indicated that in May 1975, he "expected to pay the debts of the hospital, to put it back in working order," that at the time he anticipated paying the promissory note, and that he intended to honor his agreement *617 to indemnify and hold petitioner harmless for GSH liabilities. While the record contains financial statements of Dr. Nilsson for 1972 and 1973 which reveal that he had a negative net worth in those years, the record does not show that this was the situation in 1975. Thus, we are of the opinion that the consideration received by the petitioner could be valued and that the sale should not be considered an "open transaction." Dr. Nilsson's agreement to indemnify and hold petitioner harmless for GSH liabilities and to pay petitioner's share of the partnership debts in excess of petitioner's basis is equivalent to forgiving or canceling petitioner's obligation on behalf of the partnership. As held by the Supreme Court and other courts, *618 when such an obligation is canceled and a person is relieved of responsibility to repay the obligation, it is as if he has been paid cash. Commissioner v. Tufts, 461 U.S.     (1983); Crane v. Commissioner,331 U.S. 1 (1947); Smith v. Commissioner,324 F.2d 725 (9th Cir. 1963), affg. a Memorandum Opinion of this Court. Thus, in the present case, petitioner relized value within the meaning of section 1001(b) to the extent that he was relieved of partnership liabilities. Respondent has conceded that petitioners are entitled to utilize the installment method of section 453 for reporting gain on the sale. Respondent also has conceded that in 1975 petitioners did not collect any amounts on the promissory note. Thus, the reportable amount is limited to the $339,262 of partnership liabilities of which petitioner was relieved. The next issue for decision is whether petitioners must recognize $25,156 as ordinary income under section 1250. On brief, the parties have agreed that $25,156 is petitioner's total distributive share of the difference between (1) additional depreciation and amortization taken as to section 1250 property and (2) straight *619 line depreciation. The parties further have agreed that the $25,156 must be recaptured under section 1250 and section 751(a) when petitioner is considered under section 752(d) as having received property or money in exchange for his GSH partnership interest.Thus, the sole issue involves the proper time to recapture the $25,156. We held above that in 1975 Dr. Nilsson's assumption of petitioner's share of GSH liabilities constituted relief from liabilities, which is the equivalent of money received under section 1001(b); thus the $25,156 should have been recaptured in taxable year 1975. The final issue for decision is whether any part of petitioners' underpayment of income taxes was due to "negligence or intentional disregard of rules or regulations" within the meaning of section 6653(a). On brief respondent's focus is on petitioners' alleged failure to file the 1975 fiduciary income tax return for the Family Trust, their alleged failure to furnish the Internal Revenue Service with information and records requested by the examining agent, and their substantial understatement of income from petitioner's sale of his GSH partnership interest. Petitioners argue that petitioner remembers *620 mailing the fiduciary tax return to the Internal Revenue Service and that its unavailability was due to misplacement by the Internal Revenue Service. They further assert that they were unaware that the examining agent had requested further information and records and that upon their being so informed they quickly supplied the materials. Lastly, they indicate that the understatement of income with regard to the sale of the GSH partnership interest was reasonable in light of the "open transaction" doctrine. Petitioner testified that he recalled mailing both petitioners' joint return (Form 1040) and the fiduciary return (Form 1041) from the offices of Arthur Young, CPA, in San Diego, and used the firm's postage meter on the envelopes.He testified that he mailed the Form 1040 in a separate envelope at the same time he mailed the Form 1041. He further testified that both returns were prepared by a Mr. Yarbrough. However, the Form 1040 shows that it was prepared by a Mr. Otto and it was mailed in an envelope on which postage stamps were placed. We, therefore, do not believe petitioner's testimony with respect to the mailing of the Form 1041 for the year 1975 but conclude that his recollection *621 must have been with respect to a year other than 1975. The record shows that without the Form 1041, respondent was furnished with no information as to the sources of the income petitioners were reporting or the deductions they were claiming. No reason was given by petitioners for their failure to furnish the information as to their income and deductions to respondent. Respondent's determination of negligence or intentional disregard of rules and regulations is presumptively correct. Bixby v. Commissioner,58 T.C. 757 (1972); Inter-American Life Insurance Co. v. Commissioner,56 T.C. 497 (1971), affd. per curiam 469 F.2d 697 (9th Cir. 1972). Petitioners have failed to show error in respondent's determination of the addition to tax under section 6653(a) and therefore we sustain respondent's determination on this issue. In accordance with the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year here in issue. ↩
2. Respondent's notice of deficiency determines that the $12,375 addition to tax under sec. 6653(a) applies to petitioners' taxable year 1975. However, in respondent's Answer and first and second amended answers he asserts that this addition to tax applies to taxable year 1977, but prays that "the Court redetermines the addition to tax for the taxable year 1975 under the provisions of I.R.C. sec. 6653(a)↩." Because it is clear that 1975 is the taxable year in issue, we view respondent's reference to 1977 as erroneous; we consider 1975 to be the sole taxable year in issue and respondent's determination concerning the addition to tax as applicable to 1975.
3. On this return petitioners stated that the amount realized from the sale of a partnership interest had no ascertainable fair market value and in the alternative elected to report the gain on the installment basis under sec. 453.↩
4. On April 30, 1975, GSH liabilities were $1,750,979.70.↩
5. On brief respondent agreed to treat petitioner's total distributive share of the difference between (1) additional depreciation and amortization taken as to sec. 1250 property and (2) straight line depreciation as $25,156.↩
6. Petitioner testified that he considered Mr. Greene's retirement agreement to be a final accounting; however, we do not agree. That agreement merely acknowledges that Mr. Greene has no claim against the partnership assets or remaining partners other than his interest in the investment account and provided that Mr. Greene would act as a consultant to the Company for a specified term.↩
7. At trial and on brief, petitioners suggest that paragraphs 6(b) and 9 show the existence of an enforceable promise by Mr. Greene to repay a sum certain.We do not agree with petitioners. Paragraph 9 merely provides that in no event shall a partner's withdrawals exceed his interest in his income account as shown on the partnership books; it implies that excess withdrawals shall be deemed to be unreasonable in amount. Paragraph 6(b) of the Partnership Agreement indicates that the Company's losses↩ shall be applied to the partners' capital accounts and may generate a deficit in the capital accounts. However, it does not require partners to repay the deficit amounts due to partnership losses. Even the provisions applicable to retiring partners do not suggest that a retiring partner is obligated to repay any deficit amount in his capital account; paragraphs 10(a) and 10(b) merely suggest the method of payment by the Company to a retiring partner of a positive balance in the retiree's capital account.
8. A statute of California's Uniform Partnership Act (Cal. Corp. Code sec. 15021 (West 1977)) provides that a "partner must account to the partnership for any benefit * * *." This provision requires an accounting, but if it is not performed, the section does not establish a per se enforceable promise by the benefitting partner to repay the partnership for the undue or the excessive benefits. Case law supports our interpretation of the California statute.It is clear that a final accounting must be completed before a partner may bring an action in law against another partner upon claims arising from partnership business. See e.g. Mosher v. Helfend,6 Cal. App.2d 760, 44 P.2d 1050 (1935); De Rigne v. Hart,94 Cal. App. 209, 270 P. 1013↩ (1928).
9. The testimony reveals that Dr. Nilsson was frustrated with petitioner and vice versa; their parting was mutually desired. Petitioner testified that Dr. Nilsson was making it difficult to attract new investors and to attract new doctors to increase patient use of the hospital. Dr. Nilsson testified that he was unhappy with petitioner's management of the hospital.↩